The next case is 23-2029 United States v. Stepp. Counsel for Appellant, make your appearance and proceed, please. May it please the Court, Chief Judge Holmes, Counsel. My name is Joel Myers and I represent the Appellant, Justin Stepp. I hope to reserve two minutes or above, maybe that's aspirational. Asking the Court today to reverse Mr. Stepp's conviction, there's no reasonable jury who could have convicted him on the evidence that was presented. The evidence in this case, Your Honors, I believe is characterized more by what it lacked than what it contained. There's no DNA evidence, there were no fingerprints, there was no surveillance, there were no admissions, there was no testimony of any witnesses whatsoever seeing Mr. Stepp handling firearms or ammunition. But there was a firearm and there was ammunition in his sight. You'll concede that? I will concede even within his grasp with respect to the car that there was a loaded firearm obviously that contained more ammunition. And even the home with the ammunition being by the men's shoes and so forth. I assume you're not contesting? I would like to talk about the men's shoes for a second. I certainly will concede that the photographs show that there was ammunition by men's shoes. And on the constructive possession part of this, with the ability to obtain and the intent to obtain, are you only then arguing the intent to possess? Yes. All right. Certainly, I break it down into two things. We have the car and we have the home. Certainly in the car he had the ability, similar to the driver of the car, I don't believe based upon the unique circumstances of that case, he demonstrated in any way the intent whatsoever to reach into that center console, which was equidistant between both him and the driver and owner of the vehicle, his then girlfriend, Ms. Ratliff. Talking about what evidence there was, and I'm sorry about the interruption. No, no. In the car, there's this theory that he shot himself with the gun that's in the car. Is there any ballistic evidence tying the wound in his leg to the gun in the car? No. In fact, quite the contrary. There was further no evidence that that gun itself had been fired. All of the chambers or places where the bullets come out of the gun guide were all filled, so the gun was fully loaded. And the detective at the time, Duane Holder, was specifically asked whether there was any evidence that that gun had been fired. Similarly, there was no evidence of medical records or anything that was obtained by the government to show that it was indeed a gunshot wound. Now, certainly I will concede that that story about the shooting may seem bizarre, but it's nothing to do and it doesn't add at all to whether or not Mr. Stepp exercised, in the moments within which he was charged, both in the car and in the home, any intent to exercise dominion and control over a firearm or ammunition. What about an entrance wound, exit wound? Was there a path of the bullet? Again, there was nothing in the record with respect to that. My understanding is that it might have been more of a crease wound, but I think I'd just be speculating. There was no evidence at trial or in the record to suggest anything about the wound. There was evidence to suggest that he did go to the hospital and return from the hospital, and that was it. You made a statement about the moment in which he's charged as it relates to the car. Well, the indictment runs from February 7th to February 8th, so he was charged for a period of time longer than that specific moment in the car. Why wouldn't evidence that he shot himself accidentally bear on the question of whether he intended, even in this later moment, to exercise dominion and control over the firearm? Okay, well, I'll break it down in a couple ways. I think Judge McHugh's question, I think, speaks to that. There was no evidence whatsoever to suggest any ballistics matching that particular firearm, or any firearm for that matter, or the fact that it was indeed a gunshot wound to his leg. There was no evidence with respect to that particular firearm that it had been used at all. There was no evidence that it was even that it was a gunshot wound to his leg? Other than the story that came in as hearsay from Mr. Stebb's girlfriend, Ms. Ratliff, through the agent. Ms. Ratliff did not testify. It was only the report from the deputies who said they were responding to a gunshot wound based upon what Ms. Ratliff had told them. So it was not designed to, it wasn't introduced to show that he was indeed shot. It was introduced to show why they went down by the lake to look to see whether there was evidence of it. Well, with respect to the accidental shooting theory, the testimony about the ease with which a gun could misfire was related to the type of gun in the console, correct? Yes. Okay. So if the, I mean, could the jury make a reasonable inference that you have testimony this gun easily fires? You've got the guy with the wound that looks like it might be a gunshot wound, and then you can infer that he shot himself? Whether it's a reasonable inference or not, I would assume it's not a reasonable inference. I do believe they could speculate to that. I think it's contradicted again by the fact that there was no indication that that particular gun, which is very small in size and, to be honest, as seen from the picture, is almost kind of hidden within the holster itself. But nevertheless, there was no indication that that particular gun had been fired. It was specifically asked to the witness at trial. Okay. Let's move to the house. Sure.  Yes, of course. So in the house, there seems to be bullets sort of just strewn about. And some of those bullets are found by men's shoes. Some of them are found near a computer that they think that they have at least offered the theory that it's his computer. What's your response to that, connecting those bullets? First, let me make sure that you agree with me that bullets are enough. Ammunition is enough. One hundred percent. Okay. And I do concede that Mr. Stebb was a prohibited person and was not able to possess either firearm or ammunition. Okay. Turning to that, I respectfully submit that I believe it was a staged presentation. Did you object to the admission of those photographs at trial? No, I didn't, but I actually spoke about it and compared and contrasted them during my closing argument. So I did present them at the trial. It wasn't until after seeing them that I was able to determine that they were indeed, I believe, staged. So the jury could have decided to believe that the officer's statement that that's how they were found as opposed to your suggestion that it wasn't? Yes, but I 100 percent agree with you and evidently they did. Okay. That's why we're here. Okay. So assuming for the moment we have the bullets found by the men's shoes, is that enough to show intent to possess that ammunition? I submit that it's not. I submit that it's not based upon the fact that neither of them were in the home at the time. We're still dealing with a joint occupancy case. And the mere connection or close proximity to men's shoes, there was nothing even connecting Mr. Stebb to those men's shoes. Like Your Honor pointed out earlier, things were strewn around the house. I don't think that, however, ammunition was strewn around the house. These were isolated bullets that somehow are cleared in the frame of screen by men's shoes, which mysteriously were different in separate photos relative to the same bullet. As to where the computer is, my recollection is that they were all on the cabinet. In a common area. It's not in her bedroom versus his bedroom or those sorts of things. Those sort of facts where there's a question about intent to possess, those are different cases than what we have here, which is the living room floor. There's ammunition. And so I guess your theory is that it was her ammunition and he saw the ammunition and thought to himself or said, I'll never touch that ammunition. I don't think it goes that far. I think that my theory is that there's no connection between him and the ammunition. I don't know whether or not he saw the ammunition. I firmly believe the ammunition wasn't the way it was presented to the jury based upon the photographic evidence that the government themselves admitted and relies on and further relies on in their response brief. Well, that last line of argument just is not going to be relevant for us. That's not your closing argument. It's not evidence. The only evidence was the photos, which you didn't object to, right? I didn't object to the admission photos, certainly not. But the photos themselves, I think, actually strengthen the argument even before the court, as they are before the court today, that they don't connect Mr. Stepp to the ammunition itself, looking at the computer. The home, if we assume it's a joint occupancy, it's a man and a woman who are the joint occupants. And it wasn't a high heel that was in the picture with the bullet. It was a man's shoe. So, I mean, I don't think we're at speculation for the jury to infer that that's his shoe. Okay. And are you saying that's still not enough? I believe that that's still not enough. What do we need? I believe you need some nexus connecting him in the time within which he was charged, connecting him to the ammunition case. Mr. Stepp was not present at the location. Well, you don't have to be present, do you? No, no. But there's nothing, again, I think we would need forensics in the case. The line of cases that we've seen before the court, that the court has found in joint occupancy cases, are notorious in the sense that they have either DNA or fingerprints or admissions. Well, no, we have some where it's hidden under his side of the mattress. And in that case, that was someone where someone claimed that that was indeed admitted that that was their mattress. There's no admission about the shoes at all, who they were, but I certainly will concede that they do mention that they're not high heels. I'm not saying that there was a third party living in the house. I think we'll concede that the joint occupancy in the house was Mr. Stepp and Ms. Robinson. And there was blood found at the house? Nothing had been determined that was blood. The officers speculated that it was blood, but there was no evidence to suggest that this was tested in any way that it was blood. Similar with the truck outside. There were smears on the top of the truck and droplets within the house that may have… That appear to be blood. Is it in fact the case for purposes of the sufficiency argument you're making that it would be defeated by either a determination that the evidence was sufficient as it relates to the vehicle, the firearm found in the vehicle, or the ammunition found at the home? In other words, you need to prevail in both instances. Correct. Okay, just to be clear. Now, I'm getting close to my time here, so I'm going to pivot to the second argument that I have. Even if the court does not reverse Mr. Stepp's conviction, the court should remand for resentencing based upon the procedural reasons of the sentence. The district court erred in this case by determining that the base offense level was 20. Parties agree what the key issue is in this case. While it's Mr. Stepp's first conviction that's at issue, the court really needs to determine when he began to serve the sentence of his second law. And I think the parties agree more than they disagree on this case. It's undisputed that he cannot serve the two sentences concurrently. It's further undisputed that he cannot receive pre-sentence confinement credit while serving another sentence. But the district court had a basis, which is Ms. Chavez and the good time figuring sheets, that were precise to a date. And there was a reason that that made sense. I understand you can argue otherwise, but how do you get clearer when it's that divided? Well, I think Ms., you know, respectfully, I think Ms. Chavez's testimony was less than clear on this issue. Mistakes were made and it kind of inured to the benefit. I don't think it was a clear reading of the key piece of evidence in this case, which I think is the good time figuring sheet for Mr. Stepp's conviction. And that was, you know, found, I believe it was volume one, I don't know if the page numbers tell you, 99. And in that, if we look at that quite clearly, it says pre-sentence confinement credit of three months, but also looks to the discharge date. Now the discharge date, there's a discharge of that second sentence. And that says December 27, 2006. And there was no dispute about that whatsoever. So remove a year from that and we come to December 28, 2005. It was a one year sentence and the parties don't disagree. And the discharge date is based upon the full term of the sentence. So that's actually consistent with the March 28 date and then the three months credit prior to that. Which would mean that he was discharged from that second sentence in 2005. As Judge Phillips said though, I mean that's not the point. I mean your argument could be quite plausible. But the district court's argument, the district court's rationale would have to be essentially arbitrary and without foundation. And there is a foundation for it. You had an expert, not just a lawyer, an expert, get up and say this is what the documents show. And say that some of these other documents are erroneous and therefore this is the conclusion. Now, I mean, I just have a hard time seeing what one can do with that. But say the district court had a foundation for what it did. That in and of itself, Judge, I think is arbitrary by choosing one over the other. Anderson versus, I mean the Supreme Court case says you can have two plausible explanations of something. And if the district court chooses one, as long as it's plausible, there's no clear error. Understood. I also see that my time has expired. Sure. Thank you, counsel. No, I appreciate your argument. Thank you. Good morning, your honors, counsel. May it please the court. Tiffany Walters for the United States. Considering the evidence in the light most favorable to the government, the evidence presented at trial was sufficient for a rational jury to conclude beyond a reasonable doubt that either the firearm or the ammunition. Let's start with the car and the gun in the car. I see no evidence of a nexus between Mr. Stepp and that gun. And the idea that the jury could decide that, oh, we had testimony this type of gun sometimes misfires. And this guy's suffering from a wound that we didn't even have testimony to indicate was a gunshot wound. Therefore, the jury could reasonably infer that at some point he grabbed, he had shot himself with the gun. I don't think that's inference. I think that is rank speculation. And it may be that a jury could have found that to be a leap too far. But in that case, we're not relying solely on that. Well, the jury isn't unchecked. If the jury takes a leap too far, it's our job to say that's a leap too far. And that's not a proper inference that that is speculation upon speculation upon speculation. I think it's perfectly fine to say we didn't believe their explanation of what happened. But then to say that the jury could therefore create in their own mind an alternative explanation for which there is not a shred of evidence. I'm sorry. To me, that's a leap too far. I understand, Your Honor. There was the expert testimony regarding the nature of the gun being active. But beyond that, the jury would have to infer. Well, I mean, the testimony was that this particular type of gun sometimes misfires. There was nothing to even say that the wound in his leg was caused by a gun or this type of gun. I'm correct about the evidence, right? You're correct that there's nothing to say that it was caused by this type of gun. We do, again, have Ms. Ratliff's story that he was shot. And so I think that— Well, but you said that that story was bogus, right? Well, I think the position was that the law enforcement officers— So the position was we don't believe their story of how he was wounded, shot. But therefore, we can leap to the inference that he was shot by mishandling of this particular gun at some prior period. I would concede that that is a leap. It's weak. It's weak. If we set that aside, I think there's still enough evidence, though, for a rational jury to convict on these facts. We do have the gun next to him in plain view, and we know that he— But that's not enough. All the case law says that's not enough. Certainly. But it's one piece in conjunction with other pieces of evidence. Okay. Tell me. Line them up. What are the pieces of evidence? So we have the gun within his reach and within his sight, right next to him. We have the bullets that are under the passenger seat, which is the seat that he's sitting in. We have the story that's told about the shooting, where it's told that it's happened near this abandoned bar by a lake. No evidence is found. Instead, evidence of blood is found at his home. We know that Mr. Steff is a felon. All of this sort of suggests some sort of consciousness of guilt, that there's a story— But it could be guilt of anything. I mean, it could have been a drug deal gone bad and a third party shot him. It's possible. I mean, the jury could draw different inferences from that. The other piece of evidence that we have is that we have evidence that someone snuck back into that house. What does that—I mean, yeah, they did. And, you know, if they knew this was about a felon in possession, you'd think they would have picked up the ammunition while they were there. It might have been something else they were getting out of the house. It's true. We don't know exactly what happened in that house. What we do know is that a rug was flipped over to conceal some of the blood, presumably because of what was on the underside of the item. We know that they were in there because we have the hospital bracelet that's dated in the bag and the wallet and the receipt and all of that. There's a fair inference he was bleeding in the—or somebody was bleeding in the house, likely him. Correct. And then we also have the ammunition that's under the house, which I think is part of the constellation of evidence in conjunction with the jury's hearing that he's sitting in his car with ammunition under his seat, a gun right next to him. And then in his house, there's ammunition on both sides of the security—I'm sorry. Pause there. With the ammunition, the strewn ammunition, whether in the car or in the house, which of the ammunition matches that firearm, if any? There was no firearm found that matched the ammunition found in the house. The ammunition in the car matched the gun in the car, but we did not find—or there was no gun found that matched the ammunition in the house. There are two different rounds. The two rounds were found strewn sort of under the men's shoes. I understand Mr. Steff's argument that the pictures were staged, but the jury had, in fact, a lapel camera video of the whole search that actually shows when the rounds were found. There's some testimony you say that officers want to take pictures of things. If there's things on top of the evidence that they want to photograph, they sometimes try to scoot it to the side to get a photograph, but that's not staging or fabricating. That's just documenting the evidence there. We have that. We have the bullets that were found tucked away in cabinets right next to this security monitor, which has active feeds showing that the room is in use. It's not some deserted room. This is also the room that all the items were found in that were deposited in the interim between when the house was secured and when the search warrant was executed. So all of that in conjunction from that evidence, a reasonable jury, a rational jury, could conclude that he had the intent to control at least one of the ammunition or the gun on this evidence, considering it might be favorable to the government. Was it blood? Do we know that? Or was the testimony something that looked like blood? Something that looked like blood. There was testimony that was sent off to the state lab that didn't have results. Is it your position that the theory of exclusive possession applies to the home? I mean, it just seems to me a hard stretch to make. And so I want to clarify, what's your argument there? The argument was made at trial, but I think there's a fair inference that it was joint possession, and we're acknowledging that on appeal. There were female items found in what would typically be considered female. How much do you need to, in a joint possession home, how much do you need to show that there's a nexus between one of the possessors and the ammunition? I think that's hard to quantify. I have a jury instruction say some connection, and I think Samora, this court has phrased it in terms of a nexus that shows a plausible inference of an intent to control. How one quantifies that, I'm not exactly sure. I think looking at all the cases, these are such fact-bound cases that it's hard to find anything on all fours with this specific situation. I think it really has to be considered with all the evidence in totality, and to consider whether any rational jury could have convicted on these facts. And while I recognize that this is not an overwhelming amount of evidence in this case, I do think on that very differential standard where we're looking to a jury verdict and whether or not to overturn that jury verdict, that there's enough here to affirm for sufficiency of the evidence. And is it, in fact, the case that both of the people in the occupants of the home could have constructively possessed that ammunition? Correct, and the jury instruction is instructive to that fact, and that's the same with the gun. It may well be that it was equally accessible to her right there in the front seat. If that doesn't matter, we don't have to disprove or negate that she had intent to control. We have to show that he, in fact, had that intent to control. So the fact that it's jointly accessible is not a bar. Was there evidence on his computer it was? You said the mouse pad had both of them on it. The mouse pad has both of them on it. And as I understand it, the ammunition was in a cabinet where the computer was. Was there any evidence on whose computer it was? There wasn't any evidence on that. I think the strongest evidence in the home is that the bullets were under male shoes, and that's reflected in both the video and the photographs. Do we know whether the jury convicted on the firearm, the ammunition, or both? We don't know. And does that matter? It does not matter. In other words, if we thought that it was just too slim on the firearm, and we don't know that the jury convicted on the ammunition, why are you not out of luck? There's actually no requirement that there be jury unanimity on the item, whether it be the bullet or the firearm. And so I think on review, there's no way to know that in any of these cases. So I don't think that— There's a way to know it, which is special verdict or separate counts. Correct, but that's not required in this case, and it wasn't requested by the defense either. If there's no further questions on the sentencing— Could I just follow up with that? And this may well be right, it rings a bell with me, but if six jurors thought he had an intent to control that firearm but not the ammunition, and vice versa, you'd say that's sufficient for a conviction? I think so. I point this court to— I apologize. This court has recognized that there's no requirement of unanimity, and I think that would cover that. The United States would be Brenteria, 720, Fed Third, 1245 on that one. Thank you. So if there's no further questions, I'll move to the sentencing argument. The district court did not clearly err in crediting the state court records and the testimony of Ms. Chavez from the New Mexico Department of Corrections as to his release date of February 16, 2006. If we look first to the conviction documents pertaining to the 2002 conviction, and that's the release date that's at issue here, those records are consistent. The good time figuring sheet says he was released to parole on February 16, 2006. There's no errors identified in those records. So the only way we even get to Mr. Stubbs' argument is if we completely disregard the records that are relevant to the actual conviction at issue. And even if we look to those 2006 records, we have both of the judgment and the amended judgment identify the date that pre-sentence confinement begins to run as February 17, which is the day after the release date on the 2002 conviction. So all of that supports the district court's finding, and we don't contest there are errors in the calculation of the pre-sentence confinement credit. Ms. Chavez identified them. The district court credited that testimony. Well, it's mathematically impossible. There's not 30 days, right? The errors are obvious on their face. And this sentence was entered in March 28, 2006. So whatever happened in the calculation, this all postdated his release from his 2002 sentence on February 16, 2006. So it's hard to say that these calculation errors then somehow retroactively changed the release date that had already happened at that point. Well, we're not here to decide what's right. We're here to decide whether the district court clearly erred in reaching its conclusion. And I think the record is ample to show that it did not. The district court gave specific reasons for it based on the records, based on Ms. Chavez's testimony. Mr. Steffels identified any error in the errors that were identified by the district court. There's nothing to say that obviously 39 days is not 90 days. And what is consistent in both the judgment and amended judgment is all to say that the sentence started running on the pre-sentence confinement credit started running on February 17, 2006. And so even if someone who was doing the math did it differently, that doesn't change. But that is a date that's consistent enough that the district court credited because there's no clear error there. And because the evidence was sufficient at trial, the United States would ask the court to affirm. Thank you, Your Honors. Thank you. Mr. Myers, one minute if you want it. Thank you. All right. Thank you. I'll never say no. To cease on what you said earlier, Judge McHugh, I think the government is asking this court to take a lead too far. We're here talking about, I think, to still down male shoes. And a bullet that seems to be standing upright between two shoes is how we are to believe that the house was at that time before they were manipulated for the photos. And that's the only way to show. I think counsel pointed out that sometimes things are moved aside to show where things were, which would undermine the fact that there was any connection to Mr. Stepp that he would have observed and seen this one straight bullet. The computer, there's been no indication whose computer it is at all, whether it's Mr. Stepp's, whether it's Ms. Ratliff's or both of theirs. And the items were hidden from there. So we're talking about one straight bullet that's there. As far as March 28, 2006, and then looking back and at that point having correct information from February 2006, that good time figuring sheet started on March 28, 2006. Looking back, talking about a discharge date of December of 2006. I see my time is up. Thank you for your time today. Thank you. Thank you, counsel, for your fine arguments. Case is submitted.